Filed 1/14/22  In re K.C. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re K.C., a Person Coming Under the Juvenile Court Law. | B310516 (Los Angeles County Super. Ct. No. 17CCJP02195A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. M.M., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen C. Marpet, Judge Pro Tempore. Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo Castro Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Kimberly Roura, Senior Deputy County Counsel for Plaintiff and Respondent.

_____

At a March 2018 hearing where appellant M.M. (mother) was not present, the juvenile court declared mother's twelve-year-old son K.C. (KC) a dependent under Welfare and Institutions Code section 300 and scheduled a permanency planning hearing without ordering reunification services for mother.[1]  In November 2020, mother petitioned the court to vacate its March 2018 findings and orders under section 388 and *Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 481 (*Ansley*).[2]  Mother argued the Los Angeles County Department of Children and Family Services (the Department) had given her improper notice of the March 2018 jurisdiction and disposition hearings.  The juvenile court denied mother's petition, and she challenges this decision on appeal.  We reject mother's arguments and affirm the order denying mother's section 388 petition.

---

[1] Further section references are to the Welfare and Institutions Code, unless specified otherwise.

[2] *Ansley* authorized a party to a dependency proceeding to use section 388 to seek relief for a due process notice violation.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Family Circumstances and Dependency Petition*

KC was born in 2005, when mother was 15 years old. KC's biological father was murdered when KC was less than two years old, and mother feared gang retaliation. Sometime in 2011 or 2012, an older family friend named Phil began caring for KC. Phil moved to Los Angeles, taking KC with him. Mother gave Phil temporary custody of KC to protect KC from gang violence in Washington, D.C. Mother signed a notarized letter granting custody of KC to Phil, but the letter was never filed in any court. By early 2018, KC was 12 years old and still living with Phil, who was 78 years old. Mother was residing in Washington, D.C. with KC's half-brothers, ages 5 and 7. Mother was employed with a monthly income of around $2,000.

KC came to the Department's attention in March 2017 after he missed 22 days of school, and Phil did not respond to the school's multiple attempts to contact him. The Department took KC into protective custody in late November 2017 after KC was detained for spitting on a security guard and social workers were unable to locate or contact Phil or Phil's roommate.

On December 1, 2017, the Department filed a petition alleging under section 300, subdivisions (b) and (g), that mother's whereabouts were unknown, father was deceased, and Phil was unwilling and unable to provide care and supervision for KC. Although the Department sent notice of the detention hearing by certified mail to a Washington, D.C.

3

address, it is unclear whether the address was mother's correct address at the time. Neither mother nor Phil were present at the detention hearing on December 4, 2017. The court appointed counsel for KC. The court ordered the Department to investigate KC's legal status and "properly notice [Phil] and the mother of the next court hearing." It also ordered monitored visits for Phil and mother, including phone contact with mother.

### December 2017 to March 2018 – Notice to Mother and Jurisdiction and Disposition Hearing

A social worker interviewed Phil on December 21, 2017. Phil reported he had been caring for KC since KC was young and did not intend to leave KC unsupervised. Phil offered explanations for his unavailability during the Department's initial investigation and for KC's school absences. Phil was unaware of KC's recent involvement with a gang, but did acknowledge that KC had started stealing clothes and missing school after a tagging incident with a group of older friends. Phil wanted KC returned to his care and was willing to comply with court reunification orders.

The social worker interviewed KC at school. KC reported Phil has always provided for him and took good care of him. He denied any neglect or abuse. When asked whether he wanted to return to mother in Washington, D.C., KC said he wanted to remain in Phil's care, as he was bonded to Phil and Phil was the person who has always taken care of him.

The Department was able to make contact with mother and learned her correct phone and address information.

4

Mother spoke with a social worker by phone on January 11, 2018.  Mother was coherent, engaged and did not appear to be under the influence.  Mother confirmed that she was confident in Phil's ability to care for KC.  However, because Phil was getting older and she did not want to put too much stress on Phil, mother said she wanted KC back in her care.  She planned to comply with court orders and reunify with KC.  Mother reported she could not afford a plane ticket to Los Angeles and would not be able to make it to court unless the Department could pay for her airfare, nor could she take the time off work.  Phil reported he would try to help mother pay for her plane ticket so she could show up in court.  In a section of the jurisdiction and disposition report entitled "concurrent planning," the report states that mother was informed about concurrent planning and that if services were provided, mother would only have one year of services to show her commitment to reunification.  Mother reported that she wanted Phil to be KC's caregiver unless he was unable to care for KC, in which case she wanted KC to be with family.  There is no indication in the record that mother ever asked for the adjudication or disposition hearings (or any other hearings) to be continued so that she could appear.  Nor is there any evidence that mother requested appointment of counsel for approximately two years, until after January 4, 2020.

The Department reported it might seek an order bypassing reunification services for mother under section 361.5, subdivisions (b)(9), (b)(14), and (g).[3]  It recommended

---

[3] Section 361.5, subdivision (b), lists circumstances under which a juvenile court may deny reunification services to a
(*Fn. continued on the next page.*)

that the court grant no family reunification for mother, identify Phil as a de facto parent, and order reunification

---

parent. Subdivision (b)(9) applies when "the child has been found to be a child described in subdivision (g) of Section 300; that the parent or guardian of the child willfully abandoned the child, and the court finds that the abandonment itself constituted a serious danger to the child; or that the parent or other person having custody of the child voluntarily surrendered physical custody of the child pursuant to Section 1255.7 of the Health and Safety Code. For the purposes of this paragraph, 'serious danger' means that without the intervention of another person or agency, the child would have sustained severe or permanent disability, injury, illness, or death. For purposes of this paragraph, 'willful abandonment' shall not be construed as actions taken in good faith by the parent without the intent of placing the child in serious danger."

Subdivision (b)(14)(A) applies when "the parent or guardian of the child has advised the court that the parent or guardian is not interested in receiving family maintenance or family reunification services or having the child returned to or placed in the parent's or guardian's custody and does not wish to receive family maintenance or reunification services." Subdivision (b)(14)(B) imposes the following additional requirements: "The parent or guardian shall be represented by counsel and shall execute a waiver of services form to be adopted by the Judicial Council. The court shall advise the parent or guardian of any right to services and of the possible consequences of a waiver of services, including the termination of parental rights and placement of the child for adoption. The court shall not accept the waiver of services unless it states on the record its finding that the parent or guardian has knowingly and intelligently waived the right to services."

Subdivision (g) addresses requirements for when a court schedules a hearing under section 366.26.

6

services for Phil, specifically parenting and gang awareness classes. On January 19, 2018, ten days before the scheduled January 29, 2018 jurisdiction and disposition hearing, the Department sent to mother by first-class mail a notice of hearing, together with the petition and the Department's jurisdiction and disposition report. The same materials were mailed to Phil at his Los Angeles address. The notice included among several advisements that "You have the right to be present at the hearing, to present evidence, and to be represented by an attorney. The court will appoint an attorney for you if you do cannot afford one."

By February 2018, KC was living with foster parent D.B., with whom KC would continue living for the next 18 months. Also in February 2018, the court granted Phil's request for de facto parent status, appointed an attorney to represent Phil in the proceeding, and ordered unmonitored visits for Phil.

The jurisdiction and disposition hearing was continued a number of times, eventually taking place on March 27, 2018. Mother was not present, and the court did not appoint counsel to represent her. Phil's appointed counsel was present, but Phil was not. The court sustained amended allegations, finding KC to be a dependent under section 300, subdivisions (b)(1) and (g), and ordering him removed from mother's custody. The court ordered no family reunification services for mother.[4] The court also scheduled a 366.26 permanency

---

[4] According to the March 27, 2018 minute order, the court ordered no reunification services under section 361.5, subdivision (b)(14). The record does not include a reporter's transcript for the
(*Fn. continued on the next page*.)

planning hearing.[5]  The court granted Phil unmonitored day visits, with the Department having discretion to liberalize visitation.

***April 2018 to August 2019***

KC did well in his placement with D.B., making positive progress by meeting with a therapist and rehabilitation specialist weekly and participating in child and family team (CFT) meetings every two to three months.  Mother was not listed as a participant in CFT meetings other than an initial CFT meeting in April 2018.  KC maintained contact with mother by telephone, and had a large support team that included mother.  KC had twice weekly unmonitored day visits with Phil.

At the initial CFT meeting in April 2018, Phil and mother participated by phone while KC participated in person.  KC's goal was to reunify with Phil, and the team created a plan to work towards that goal.  KC admitted to using prescription cough syrup during a visit with Phil, and returning to his placement while under the influence.

At a June 2018 CFT meeting, KC wanted to remain with D.B. until he was able to return to Phil's care, but Phil had not

March 27, 2018 hearing, but at the section 388 hearing on January 15, 2021, county counsel argued the minute order did not accurately reflect the basis on which the court denied reunification services for mother.

[5] The section 366.26 hearing was continued numerous times during course of the proceedings, with the court holding periodic permanency review hearings throughout.

been able to secure stable housing, a requirement to move forward with obtaining a Relative Family Approval (RFA) assessment.  KC requested that visits with Phil take place outside the Boyle Heights and East Lost Angeles areas, because the environment and easy access to drugs could contribute to his engaging in risky behaviors.

In August 2018, Phil missed a CFT meeting because he missed the train and did not respond to attempts to call him so he could participate by phone.  The meeting focused on KC's goal of reunifying with Phil and acknowledging that Phil might not be able to find stable housing in a location that is safe for KC and might not be able to safely supervise KC.

By October 2018, Phil had obtained stable housing and began the RFA assessment process so that KC could move in with him.  The CFT team expressed concern that Phil's new home was close to where KC had previously affiliated with gangs, but Phil believed he could keep KC busy and KC would not make the same poor choices he had made in the past.

CFT meetings in December 2018 and January 2019 focused on the possibility that KC would return to Phil.  However, during a weeklong visit with Phil around Christmas, Phil allowed KC to go clothes shopping and hang out with friends at Union Station on his own.  Both activities demonstrated the risk of KC returning to gang-related activities, as KC purchased clothing identified with gang members, and acknowledged that if someone had approached him at Union Station and asked where he was from, he would have responded with the name of the gang he was reportedly initiated into at age 11.

At a permanency planning review hearing in March 2019, the court ordered that over spring break, KC could have extended visits with Phil, the Department would have discretion to place KC with Phil once the RFA was completed, and the RFA was to be completed by July 10, 2019.

KC's extended visits over spring break went well. At a CFT meeting in late May 2019, the team acknowledged KC's significant progress, but also expressed concern about the fact that his grades were slipping and he returned from a visit with Phil appearing to be under the influence of drugs. The Department suspended overnight visits in June 2019, after KC returned from one overnight visit with a bruised/swollen eye and from another visit appearing to be under the influence of marijuana. When a social worker met with Phil to address concerns about ensuring KC's safety and Phil's lack of awareness of KC's activities during visits, Phil minimized the Department's concerns. Phil also informed the Department that he was withdrawing his application for RFA approval, explaining that he did not know if KC would be placed with him and he did not want to purchase a bed for KC. KC's permanent plan was updated to legal guardianship with D.B., with whom KC had been living since 2018. Both D.B. and KC were in agreement with the new plan.

KC and another foster youth who was newly placed with D.B. ran away from D.B.'s home the night of August 11, 2019. D.B. pointed out that KC had never run away before, but that the newly placed foster youth had a history of running away in his earlier placements and may have influenced KC to run away as well.

Mother reported she spoke to KC briefly on the morning of August 12, 2019, and he said he was getting off a train. The Department's report surmised that the two youths had taken an early morning train from Palmdale to Union Station. Mother said she would contact the social worker if she heard from KC. The court issued a protective custody warrant, which was recalled a week later when KC was located. KC was found in Boyle Heights on August 16, 2019, after being shot in the calf by someone in a rival gang. Mother flew to Los Angeles, visiting KC in the hospital and after his release. D.B. monitored mother's visits and reported that mother was loving and affectionate, and KC appeared to enjoy mother's attention and affection. Prior to mother's visits, KC had not seen his mother since the age of five or six.

KC ran away from D.B.'s home a second time on August 25, 2019. Based on KC's social media conversations, D.B. believed KC wanted to return to the East Los Angeles/Boyle Heights area to be an active member in his gang. Mother then returned to Los Angeles to try to locate KC, but she was not able to find him. The social worker spoke to mother, who denied any recent contact with KC or having any information about KC's whereabouts. Mother agreed to notify the social worker if she had any updated information. The court issued a new protective custody warrant.

***August 2019 to January 2020***

KC remained missing from August to December 2019. He stayed in the homes of different adult "homies" in Los Angeles, and then some friends took him on a three-day drive

to Washington, D.C. where he arrived at his mother's home on Friday, December 27, 2019. During his time in Los Angeles, he acquired multiple gang affiliation tattoos. While mother and maternal relatives reportedly urged him to turn himself in once he arrived in Washington, D.C., and eventually took him to a police office, he only reported to a police station on January 3, 2020, after he had been in Washington, D.C. for a week. There is no indication in the record that mother contacted anyone at the Department until after January 3, 2020. A child services agency in Washington, D.C. took KC into protective custody, and a Department social worker accompanied him on a return flight to Los Angeles on January 8, 2020. KC was placed with a new caregiver (T.N.).

Mother and KC's maternal great aunt both wanted KC to be placed in Washington, D.C. under the care of either one of them. KC also expressed he wanted to return to mother's care, and if that was not possible, he would like to be placed with maternal great aunt. Mother reported that due to financial difficulties, she was unable to attend the scheduled January 15, 2020 court hearing, but she would make an effort to attend in order to request KC's return to her care. If she was unable to be present, she would contact the court by phone.

Mother was not present at the hearing on January 15, 2020, but an attorney made a special appearance on mother's behalf.[6] At the request of minor's counsel and the

---

[6] The reporter's transcript reflects that mother's attorney announced her special appearance, but we see no appointment order or indication of the special appearance in the clerk's
(*Fn. continued on the next page.*)

Department, the court recalled KC's protective custody warrant, ordered an evaluation of mother and maternal great aunt under the Interstate Compact on the Placement of Children (ICPC; Fam. Code, § 7900 et seq.), gave T.N. educational decisionmaking authority and ordered the Department to refer KC to Homeboy Industries for tattoo removal and other providers.

### *February 2020 to November 2020*

On February 21, 2020, KC violently assaulted another youth on or near school grounds and was arrested for felony assault. A section 241.1 report filed on March 10, 2020 recommended that probation be the lead agency while KC had juvenile delinquency and dependency cases pending.[7] KC ran

---

transcript. When minor's counsel requested an Interstate Compact on the Placement of Children (ICPC) for maternal great aunt, she also asked to explore mother as a placement option, suggesting that mother's counsel "may pursue a 388." Mother's counsel responded, "I can't make any requests. My understanding is that notice probably is not an issue but out of an abundance of caution, it's special appearance for me today." Ten months later, on November 19, 2020, the same attorney was appointed as mother's counsel and filed a section 388 motion on mother's behalf.

[7] Under section 241.1, subdivision (a), "Whenever a minor appears to come within the description of both Section 300 and Section 601 or 602, the county probation department and the child welfare services department shall, pursuant to a jointly developed written protocol described in subdivision (b), initially (*Fn. continued on the next page*.)

away on March 17, 2020, after smoking marijuana in T.N.'s home. The court issued an arrest warrant for KC for violating the terms of his house arrest. KC maintained communication with the social worker, Phil, mother, and T.N. during March and April. He reportedly did not want to turn himself in yet because he was worried about the consequences with probation, including possible detention in juvenile hall. He was considering turning himself in, but did not want to be in juvenile hall while COVID-19 was still so widespread.

With Phil's encouragement, KC turned himself in on April 30, 2020. He admitted to the delinquency petition, which was sustained as a felony count, and began serving a five to seven month sentence at juvenile camp. On May 1, 2020, the dependency court vacated an upcoming review hearing, continuing the hearing to November 19, 2020 due to COVID-19. Mother's ICPC request was approved on September 25, 2020.

In late September, KC's multi-disciplinary team agreed that probation would request an early release date (October 20) and recommend that the Department become the lead agency. Due to KC's involvement in incidents following that meeting, his release date was changed to November 23, 2020.

The Department's November 2020 status review report stated that KC had been actively participating in therapy and substance abuse groups while in juvenile camp, and had made

determine which status will serve the best interests of the minor and the protection of society. The recommendations of both departments shall be presented to the juvenile court with the petition that is filed on behalf of the minor, and the court shall determine which status is appropriate for the minor."

a lot of progress. KC appeared to have matured a great deal and was preparing to become a father, as his girlfriend was pregnant and due to give birth to their daughter on December 30, 2020.

On November 16, 2020 the delinquency court granted a section 778 petition,[8] releasing KC to the Department, with the Department taking over from probation as the lead agency. The following day, KC was placed with new caregivers (the Ps), who lived about a mile away from KC's girlfriend. The Ps were committed to helping KC with his transition to fatherhood, including his participation in prenatal care appointments and visits once the baby was born. KC was very happy to be released from probation camp and wanted to focus on doing well in school and being a present and active parent for his daughter once she was born. The concurrent planning assessment for KC recommended legal guardianship with his maternal great aunt in Maryland, but KC did not want to be placed with her. KC did not want to live with any of his East Coast relatives, and preferred to remain in the foster care system until he was ready to emancipate.

---

[8] Section 778 provides that a when a minor has been declared a ward of the court, a person having an interest in the minor, including the minor's parent or guardian ad litem, "may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a ward of the juvenile court for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

***Mother's Section 388 Petition***

On November 19, 2020, the court appointed counsel for mother, appointing the same attorney who previously made a special appearance on mother's behalf in January 2020. Mother filed a section 388 petition seeking to vacate the court's March 2018 jurisdiction and disposition orders based on improper notice, or alternatively grant her reunification services. As additional evidence of changed circumstances, mother alleged her situation had stabilized and she had been approved under ICPC for KC's placement, and the Department had resumed its status as lead agency. Mother alleged KC was not in a stable placement with a permanent plan, and it was in his best interests to live with his mother and siblings, near extended family. The court scheduled a hearing on mother's petition.

In an interim review report filed in January 2021, the Department pointed out that the court's minute order from the March 27, 2018 jurisdiction and disposition hearings stated that notices of the proceeding had been given as required by law. The Department recommended denying mother's section 388 petition because it would not be in the best interests of teenaged KC to move to Washington, D.C. to return to mother's care. Rather, since his girlfriend became pregnant in March 2020, KC had become adamant about remaining in Los Angeles to be an active and involved parent. Shortly after arriving at probation camp, KC left the gang and stopped associating with gang members after four years of gang involvement. Knowing he was going to be a father was the only thing that was a strong enough motivator for him to leave

16

the gang, because he did not want his daughter to lose a parent, as he did when he was young and his father was killed due to gang violence. Responding to mother's allegation that KC was not in a stable placement and had no permanent plan, the Department pointed out that the Ps wanted KC to continue to be placed with them. The location of their home within walking distance of KC's girlfriend's home would allow him to have regular contact and involvement in her life once the baby was born. KC said it was too soon to know if he wanted a legal guardianship with the Ps, but he wanted to continue in their care and did not want to return to mother across the country. KC's girlfriend was 16 years old, and her mother would not allow her to move out of the home until she was 18.

At the section 388 hearing, the Department argued that the court should reject mother's improper notice argument because mother was actually aware of the proceedings and did not assert otherwise. Both the Department and minor's counsel argued that while conjoint counseling between KC and mother might be helpful, mother's alternate requests for placement or reunification services were not in KC's best interests, as he wanted to stay in Los Angeles to remain close to his newborn daughter. The argument from mother's counsel focused on the absence of any indication that anyone reached out to mother to give her the opportunity to have counsel appointed at the outset of the case. On the question of whether mother had been prejudiced by the disposition order bypassing reunification services, county counsel acknowledged that the court's minute order stated the court denied reunification under subdivision (b)(14), which required a

17

written waiver, but her recollection was that the intention at the disposition hearing was to deny reunification under a different subdivision pertaining to abandonment.

The juvenile court denied the section 388 petition, rejecting her argument under *Ansley*, *supra*, 185 Cal.App.3d 477 and finding that granting the requested relief would not be in minor's best interests. The court stated that Mother actually knew about the case, communicated with the Department, and "all she needed to do was pick up the phone, call the clerk say, I want a lawyer and a lawyer would have been appointed. She didn't do that. She didn't do anything. But she continued to participate in this program with – after this case started with this child. It wasn't as if she didn't know about it and didn't participate in it. So I'm denying *Ansley*. I'm denying the 388. I don't think it's in this child's best interest at this time." The court denied mother's section 388 petition, stating it was denying the *Ansley* notice argument and finding that 388 relief was not warranted because the requested relief was not in minor's best interests. The court did not expressly address mother's argument about the denial of reunification services. Mother timely appealed.[9]

## DISCUSSION

Mother contends that the juvenile court erred in denying her January 2020 section 388 petition because statutorily defective notice of the March 2018 jurisdiction and disposition

_____

[9] The juvenile court continued the section 366.26 hearing to May 2021. The record does not disclose the outcome of that hearing.

hearing resulted in a constitutional violation of her right to counsel. Although the Department's notice fell short of statutory requirements, mother has not shown how the deficient notice caused her non-appearance at the hearing or her failure to request appointment of an attorney to represent her. Without such a showing, or any other explanation of how the lack of statutory compliance prejudiced mother, we affirm.

### *Standards of Prejudice and Review*

Mother challenges the juvenile court's denial of her section 388 petition. We review the court's ruling on the petition for abuse of discretion (*In re E.S.* (2011) 196 Cal.App.4th 1329, 1335), but consider the underlying determination whether mother received adequate notice de novo (*In re J.H.* (2007) 158 Cal.App.4th 174, 183). In determining whether any error in attempted notice is prejudicial, we apply the harmless beyond a reasonable doubt standard of prejudice. (*In re Marcos G.* (2010) 182 Cal.App.4th 369, 387 (*Marcos G.*); *In re J.H., supra*, 158 Cal.App.4th at p. 183; but see *In re R.F.* (2021) 71 Cal.App.5th 459, 474 [applying the *Watson* standard requiring a reasonable probability of a more favorable result because prejudice can be determined without a speculative inquiry].)

### *Statutory and Constitutional Notice Requirements*

"Notice is both a constitutional and statutory imperative. In juvenile dependency proceedings, due process requires parents

be given notice that is reasonably calculated to advise them an action is pending and afford them an opportunity to defend." (*In re Jasmine G.* (2005) 127 Cal.App.4th 1109, 1114.) "'A parent's fundamental right to adequate notice and the opportunity to be heard in dependency matters involving potential deprivation of the parental interest [citation] has little if any, value unless that parent is advised of the *nature* of the hearing giving rise to that opportunity, including what will be decided therein. Only with adequate advisement can one choose to appear or not, to prepare or not, and to defend, or not.' [Citation.]" (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 712 (*Daniel F.*).)

"After a petition is filed seeking to have a child declared a dependent of the court, the juvenile court must set a jurisdictional hearing within a specified period. [Citations.] Once the jurisdictional hearing has been set, notice must be given to the appropriate parties (§ 291, subd. (a)) and must include, among other things, the date, time and place of the proceeding and a statement of the 'nature of the hearing.' (§ 291, subd. (d)(1)–(5).)" (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 749.) If the child is detained and the person to be noticed was not present at the detention hearing, notice of the jurisdiction/disposition hearing must be served on the person by personal service or by certified mail, return receipt requested. (§ 291, subd. (e)(1).) The notice must include a copy of the petition. (*Id.*, subd. (d)(7).) "[A]lthough section 291, subdivision (e) requires either personal service or service by mail, return receipt requested if the minor is detained and the person to be served was not at the initial petition hearing, there is no requirement in that provision that the social services agency receive a return receipt signed by the parent.

Lack of a signed return receipt is not proof that a parent did not receive a notice; Evidence Code section 641 provides a presumption that letters that are correctly addressed and properly mailed have been received in the ordinary course of mail. (*In re J.H.*[*, supra*] 158 Cal.App.4th [at pp.] 183–184.)" (*Marcos G., supra,* 182 Cal.App.4th at pp. 386–387.)

In addition to this statutory right, a parent has a due process right to notice of the jurisdiction and disposition hearings. "Since the interest of a parent in the companionship, care, custody, and management of his [or her] children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford him [or her] adequate notice and an opportunity to be heard." (*In re B.G.* (1974) 11 Cal.3d 679, 688–689.) To satisfy due process, the notice must be "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" (*In re Claudia S.* (2005) 131 Cal.App.4th 236, 247.) Thus, "[s]ocial service agencies, invested with a public trust and acting as temporary custodians of dependent minors, are bound by law to make every reasonable effort in attempting to inform parents of all hearings." (*In re DeJohn B.* (2000) 84 Cal.App.4th 100, 102.)

"'Social services agencies, invested with a public trust and acting as temporary custodians of dependent minors, are bound by law to make every reasonable effort in attempting to inform parents of all hearings. They must leave no stone unturned.'" (*Daniel F., supra*, 64 Cal.App.5th at p. 711.) "'[B]ecause the failure to give notice carries such grave consequences in the

21

dependency court,' '[w]here [the agency] fails even to make an effort to provide [the parent] the procedural safeguard of notice, reversal is mandated.' (*In re DeJohn B.* [*supra*,] 84 Cal.App.4th [at pp.] 102, 107, 109–110 [reversing termination of parental rights where mother was not given notice of the six-month hearing at which reunification services were terminated and section 366.26 hearing was scheduled].)" (*In re R.A.* (2021) 61 Cal.App.5th 826, 836.)

Mother contends notice was defective because it was not provided by certified mail or personal service, as required by section 291, subdivision (e)(1). Mother primarily argues that the Department's failure give her notice by either personal service or certified mail caused her to lose not only her right to appear, but her right to legal representation. Although mother argues that the statutory defect also violated her right to constitutional due process, she does not explain how the statutory defect caused her any prejudice. Mother does not dispute that the Department made a reasonable effort to notify her of the dependency proceeding, including the jurisdiction and disposition hearings. She also does not dispute that she was aware of the dependency case and that she was in telephonic contact with the Department about the case.

### *No Right to Counsel Without a Request*

Despite evidence that mother was in contact with the Department since January 2018, and ongoing communications between mother and the Department demonstrated that mother was aware of the dependency proceeding involving KC,

22

there is no evidence mother ever appeared in court or otherwise requested appointment of counsel until January 2020, after KC ran away from his foster placement and traveled to Washington, D.C. Mother argues the statutory notice error "implicated her right to counsel", because she had a statutory right to counsel under section 317, subdivision (b).[10]  This argument incorrectly conflates the statutory notice requirements and the absence of appointed counsel, ignoring the requirements for appointment of counsel.

"Generally, . . . counsel is only to be appointed for an indigent parent when that parent 'appears and requests such appointment or otherwise communicates to the court such a desire.'" (*In re Andrew M.* (2020) 46 Cal.App.5th 859, 864–865, italics omitted.)  The very cases mother cites to show prejudice from the claimed notice error highlight her failure to establish a deprivation of counsel.  (See *In re Al.J.* (2019) 44 Cal.App.5th 652, 669 [defective notice deprived father of right to appear and right to counsel where "father unambiguously requested to be present at the jurisdiction and disposition hearing, a request that can reasonably be interpreted as including a request for appointment of counsel"]; *In re J.P.* (2017) 15 Cal.App.5th 789, 794 [juvenile court erroneously denied parent's request to reappoint counsel].)  Mother does not argue that she was deprived of an opportunity to be present at the jurisdiction and disposition hearing because of the defective notice, nor does she argue that the notice defect caused her to believe she could not request appointment of counsel.  There is no evidence in the record that mother took

_____

[10] Mother does not assert a constitutional right to counsel at the proceedings below.

23

any action or made any statement that could be reasonably interpreted as a request for appointment of counsel. We reject mother's attempt to characterize the Department's statutory notice error as implicating her right to counsel.

### *Harmless Error*

We agree with the Department that any notice error was harmless, regardless of whether we view the error as a statutory violation or a constitutional one. (Compare *Marcos G., supra,* 182 Cal.App.4th at p. 383 [statutory error was harmless]; *In re J.P.* (2017) 15 Cal.App.5th 789, 798 [harmless error analysis applies in juvenile dependency proceedings even where the error is of constitutional dimension].)

The obstacle to mother's attendance in court, and presumably her inability to seek reunification services, was not a lack of notice; the critical factor was mother's willingness to permit Phil to be KC's primary caregiver and recipient of reunification services, in addition to obstacles presented by the geographical distance and money. Mother stated unequivocally to the social worker that she would be unable to afford a plane ticket to Los Angeles, and Phil stated he would try to get a plane ticket for mother to attend. Despite remaining in telephone contact with KC as well as the social worker, mother's sole expression of interest in reunification services was based on a belief that Phil was getting older, and so caring for KC would be too challenging for Phil. As early as January 2018, the Department reported that Phil and KC would be participating in a CFT meeting "to address any orders of the court and [Phil's] position in the child's team.

Mother may be asked to participate by phone, if she is available." Despite ongoing communication between mother and KC throughout the case, KC's primary desire until June 2019 was to reunify with Phil, not mother, and mother acquiesced to that plan.

When it became apparent that reunification with Phil was no longer a viable option, KC's new plan in June 2019 was not reunification with mother, but rather legal guardianship with foster parent D.B. Even though mother flew to Los Angeles twice in August 2019, first after KC was shot and again when he ran away a second time, it was not until December 2019 after KC appeared in Washington, D.C., did mother and KC even ask about the possibility of placement closer to mother. Only after KC turned up in Washington, D.C., months after having run away from his foster placement, does it appear that mother finally took steps to request appointment of counsel. Even then, it took ten months, from January to November 2020, for mother to seek relief under section 388. Ultimately, KC opposed efforts to place him with mother or maternal relatives because he wanted to be present for his newborn daughter.

While we disagree that mother has shown notice error under *Ansley*, *supra*, 185 Cal.App.3d 477, to the extent the trial court might have erred in rejecting mother's argument about inadequate notice, any error was harmless.

## DISPOSITION

The juvenile court's denial of Mother's section 388 petition is affirmed.


MOOR, J.


We concur:


RUBIN, P.J.


KIM, J.